# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3267

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Emmanuel Rodriguez, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 12, 2007
Filed: May 7, 2007

_____

Before RILEY, MELLOY, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

Following Emmanuel Rodriguez's (Rodriguez) conviction for conspiracy to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, the district court[1] sentenced Rodriguez to 360 months' imprisonment and 5 years' supervised release. Rodriguez appeals. We affirm.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

## I. BACKGROUND

Rodriguez and his brother, Yone Rodriguez (Yone), were the focus of a three-year collaborative investigation among several law enforcement agencies based on intelligence indicating the brothers led a methamphetamine distribution conspiracy in southwest Missouri. Authorities arrested Rodriguez on December 16, 2003, upon his arrival at the Tulsa, Oklahoma, airport to pick up Jacquelyn Witt (Witt), a courier who transported methamphetamine for the conspiracy. Witt was cooperating with law enforcement after having been arrested earlier that day at the same location in possession of approximately one kilogram of methamphetamine.

Based on information provided by Witt, a reliable confidential informant (CI), and other conspiracy members, as well as from intelligence reports concerning Rodriguez and Yone, Jasper County (Missouri) Drug Task Force Detective Randee Kaiser (Detective Kaiser) applied for a search warrant for a residence believed to be owned and occupied by Rodriguez and Yone. The warrant, issued and executed on December 16, 2003, authorized a search of property located at 5165 County Lane 50 in Reeds, Jasper County, Missouri (Reeds residence). Upon executing the search warrant, officers found numerous documents bearing the names of Rodriguez and Yone, three firearms, ammunition, digital scales, and other items associated with distribution of controlled substances.

On December 19, 2003, Detective Frank Lundien (Detective Lundien), supervisor of the Jasper County Drug Task Force, applied for a second search warrant for property located at 3411 South Pearl Street in Joplin, Newton County, Missouri (Joplin residence), which officers believed to be owned by Rodriguez and Lisa Bateman (Bateman), Rodriguez's girlfriend. As the agent responsible for coordinating the investigation of Rodriguez and Yone, Detective Kaiser knew the facts contained in Detective Lundien's affidavit and search warrant application and discussed those facts with other members of the Jasper County Drug Task Force before execution of the warrant. A search of the Joplin residence on December 19 revealed several receipts for purchases and wire transfers by Rodriguez; a bond receipt dated

December 17, 2003, showing a cash payment in the amount of $3,100 from Bateman; and over $5,000 in cash.

Rodriguez was indicted for conspiring to distribute more than 500 grams of methamphetamine. Before trial, Rodriguez moved to suppress evidence seized during the execution of the two search warrants. The district court[2] denied Rodriguez's motions to suppress. The case proceeded to trial. Over Rodriguez's objections, the district court allowed the government to introduce evidence of Rodriguez's unexplained wealth[3] and testimony from a law enforcement officer regarding statements made by Witt during her telephone conversation with Rodriguez. The jury convicted Rodriguez of the conspiracy charge.

Rodriguez's presentence investigation report (PSR) recommended (1) a base offense level of 36 because the offense involved at least five kilograms but less than fifteen kilograms of methamphetamine, see U.S.S.G. § 2D1.1(c)(2); (2) a two-level enhancement for possession of a dangerous weapon, see U.S.S.G. § 2D1.1(b)(1); and (3) a four-level enhancement for Rodriguez's role in the offense as an organizer or leader, see U.S.S.G. § 3B1.1(a). Based on an adjusted offense level of 42 and a criminal history category I, the PSR calculated an advisory Guidelines range of 360 months' to life imprisonment. Rodriguez objected to the PSR's drug quantity determination and to both sentencing enhancements. The district court overruled Rodriguez's objections, sentencing Rodriguez to 360 months' imprisonment and 5 years' supervised release.

---

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

[3]The district court admitted, over Rodriguez's objection, receipts detailing a $3,200 tire purchase and a $430 security system purchase for Rodriguez's Lincoln Navigator, five Western Union receipts for wire transfers by Rodriguez totaling $4,676, and the bond receipt evidencing payment by Bateman in the amount of $3,100.

Rodriguez appeals, challenging (1) the denial of his suppression motions, (2) the admission of evidence regarding his unexplained wealth, (3) the admission of Witt's statements through the testimony of an officer, and (4) the district court's drug quantity determination and sentencing enhancements.

## II.   DISCUSSION

### A.   Denial of Motions to Suppress

Rodriguez contends the district court erred in failing to suppress the evidence seized during searches of the Reeds residence and the Joplin residence because neither search warrant was supported by probable cause. Ordinarily, when reviewing a district court's denial of a suppression motion, we review for clear error the court's factual findings and review de novo whether the Fourth Amendment was violated. United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007). However, Rodriguez did not file timely objections to the magistrate judge's report and recommendation denying Rodriguez's motions to suppress. See 28 U.S.C. § 636(b)(1). Rodriguez's "failure to file any objections waived his right to de novo review by the district court of any portion of the report and recommendation of the magistrate judge as well as his right to appeal from the findings of fact contained therein." United States v. Newton, 259 F.3d 964, 966 (8th Cir. 2001) (quoting Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994)). Thus, "we review the court's factual determinations for plain error." United States v. Brooks, 285 F.3d 1102, 1105 (8th Cir. 2002).

In reviewing the denial of a suppression motion, "we may consider the applicability of the good-faith exception to the exclusionary rule before reviewing the existence of probable cause," because engaging in a probable cause determination is unnecessary if the officers acted in good-faith reliance on a warrant. United States v. Warford, 439 F.3d 836, 841 (8th Cir. 2006). "Where a search is conducted pursuant to a warrant, the good faith exception . . . applies, and evidence should not be suppressed due to an absence of probable cause unless the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. (quoting United States v. Leon, 468 U.S. 897,

923 (1984)). The officers' reliance on the warrant must be objectively reasonable. Leon, 468 U.S. at 919. When assessing the good faith of the officers, we look to the totality of the circumstances, including any information known to the officers, but not included in the affidavit. United States v. Chambers, 987 F.2d 1331, 1335 (8th Cir. 1993).

With regard to the Reeds residence search warrant, the affidavit was not based on an anonymous tip. Rather, a CI advised Detective Kaiser that Witt was going to California to pick up a large quantity of methamphetamine for Rodriguez and Yone. Previous information indicated Witt typically stayed in California for one to two days before returning home. Officers confirmed Witt paid cash for a one-way airline ticket and flew to California on December 15, 2003. Detective Kaiser also learned Witt would be flying back from California to Tulsa. Following Witt's arrest on December 16 at the Tulsa airport, Witt corroborated the CI's allegations that Witt flew to California with Yone on December 15, where Yone carried $12,000 cash, purchased methamphetamine, and gave Witt methamphetamine to transport.[4] Witt also stated Rodriguez and Yone lived at 5165 County Lane 50 in Reeds, Missouri. According to Witt, she had been at the Reeds residence on December 15, and observed Rodriguez sell two ounces of methamphetamine to another individual. Witt further observed numerous guns, a large quantity of methamphetamine, and thousands of dollars in cash inside the Reeds residence. Detective Kaiser included all this information in the application for the search warrant.

In addition to the information set forth in the affidavit, Detective Kaiser testified at the suppression hearing that at the time he applied for the search warrant, he was aware of the following: (1) three separate sources reported Rodriguez and Yone had a trailer house in Reeds and used the residence in connection with their drug-trafficking activities; (2) officers confirmed the address and location of the

_____

[4]At the suppression hearing, Detective Kaiser testified he received several pieces of information before Witt's arrest on December 16 indicating Witt was transporting methamphetamine from California for Rodriguez.

Reeds residence by following a map prepared by Witt and by conducting their own independent investigation; (3) Juan Gonzalez, whose real name is Galdino Gallegos (Gallegos), had been arrested at the Tulsa airport on December 16, 2003, and implicated Rodriguez as having directed Gallegos to pick up Witt at the airport; (4) Witt cooperated with law enforcement following her arrest and placed a controlled telephone call to Rodriguez, resulting in Rodriguez coming to the Tulsa airport; and (5) Rodriguez and Yone had been the focus of a three-year investigation by the Jasper County Drug Task Force and other law enforcement agencies, resulting in numerous reports regarding Rodriguez's and Yone's methamphetamine distribution activities.

Considering the totality of the circumstances, we conclude it was objectively reasonable for the officers to rely on the validity of the search warrant for the Reeds residence, and the Leon exception applies. See Leon, 468 U.S. at 922-23.

With regard to the search warrant for the Joplin residence, Rodriguez asserts no reasonable law enforcement officer would have relied on the search warrant based upon the affidavit submitted in support of the search warrant. We disagree. The affidavit recounted the events occurring three days earlier, including Witt's arrest at the Tulsa airport, Witt's observations of drug-trafficking activity at the Reeds residence, and Rodriguez's written statement to law enforcement following his arrest. According to the affidavit, Witt informed officers Rodriguez's girlfriend, Bateman, lived near 34th Street in Joplin, Bateman's brother advised officers that his sister dated Rodriguez, surveillance conducted on the Joplin residence observed Rodriguez coming and going from the location, and further investigation revealed Bateman paid the waste water bill for the residence. Additionally, the affidavit discussed evidence retrieved from a garbage collection search outside the residence during the early morning hours of December 19–the same day the warrant was executed–indicating the presence of methamphetamine, items consistent with methamphetamine distribution, and discarded mail addressed to Bateman.

-6-

The officers' good-faith reliance on the validity of the Joplin residence search warrant was further bolstered, not diminished, by additional facts known to the officers, but not included within the affidavit, including (1) Rodriguez's written statement to law enforcement following the December 16 Reeds residence search, and (2) information Bateman and Rodriguez lived at the Joplin residence with their minor child. As noted previously, the officers were intimately familiar with the affidavit's facts as well as other information stemming from the extensive, three-year investigation of Rodriguez. Given the officers' knowledge at the time the Joplin residence's search warrant was executed, the officers' reliance on the search warrant's validity was objectively reasonable.

The Leon good faith exception applies. See Leon, 468 U.S. at 922-23. We therefore affirm the district court's denial of Rodriguez's motions to suppress.

## B. Admission of Evidence of Unexplained Wealth

Rodriguez contends the district court erred in admitting evidence of Rodriguez's unexplained wealth in the absence of evidence showing a lack of other legitimate sources of income. Reviewing the district court's evidentiary ruling for an abuse of discretion, see United States v. Claybourne, 415 F.3d 790, 797 (8th Cir. 2005) (standard of review), we find none. Unexplained evidence of wealth subsequent to the commission of a crime is relevant and generally admissible in the district court's discretion, even in the absence of direct proof of a defendant's prior impecuniousness. United States v. Goldenstein, 456 F.2d 1006, 1011 (8th Cir. 1972); see, e.g., United States v. Pensinger, 549 F.2d 1150, 1152 (8th Cir. 1977), cited with approval in United States v. Hankins, 931 F.2d 1256, 1259 (8th Cir. 1991). Furthermore, even assuming for the sake of argument evidence of impecuniousness or poverty is a foundational prerequisite to admitting evidence of unexplained wealth, the government satisfied this requirement by presenting testimony from one of its witnesses that it was a "hassle" for Rodriguez to distribute drugs while at work, thus Rodriguez quit his job in order to distribute drugs from his house or other locations.

## C.  Admission of Officer Chris Claramunt's Testimony

Rodriguez argues his Sixth Amendment right to confront witnesses against him was violated by the admission of testimony from Officer Chris Claramunt (Officer Claramunt), a narcotics detective with the Tulsa Police Department and a task force officer with the Drug Enforcement Administration, regarding Witt's telephonic statements to Rodriguez.  While cooperating with law enforcement, Witt placed a recorded telephone call to Rodriguez in the presence of Officer Claramunt and another officer.  Witt testified at trial that during the call, she told Rodriguez "the dope was smaller" and asked whether she would "still get paid the same amount."  According to Witt, Rodriguez responded affirmatively and agreed to pick Witt up at the airport.[5] At trial, Officer Claramunt summarized Witt's statements to Rodriguez by testifying, "Basically that [Witt] had arrived at the airport and her ride wasn't there and [she stated] I need a ride.  I'm nervous.  I've got 2 pounds of meth on me.  You [Rodriguez] need to come get me."  At the end of the government's direct examination of Officer Claramunt, counsel for Rodriguez objected, arguing the testimony constituted inadmissible hearsay.  The district court overruled the objection, holding the testimony was admissible to show Rodriguez's state of mind and to place into context Rodriguez's follow-up statement agreeing to come to the airport.

Because Rodriguez did not raise a Confrontation Clause objection to this testimony at trial, we review his claim for plain error.  See, e.g., United States v. Sharpfish, 408 F.3d 507, 511 (8th Cir. 2005); United States v. Pirani, 406 F.3d 543, 550 (8th Cir.) (en banc), cert. denied, 126 S. Ct. 266 (2005) (setting forth plain error standard of review).  In Crawford v. Washington, 541 U.S. 36, 53-54 (2004), the Supreme Court held the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Regardless whether Witt's statements to Officer Claramunt were "testimonial," they do not implicate

---

[5]The testimony of Tulsa Police Department Officer Annette Williams, who was present with Officer Claramunt during Witt's conversation with Rodriguez, corroborated Witt's testimony on this topic.

Rodriguez's right to confrontation. Officer Claramunt's testimony recounting Witt's telephonic statements was admitted to show Rodriguez's state of mind and to place Rodriguez's statement into context, that is, what caused Rodriguez to arrive at the airport, and the testimony was *not* offered or admitted to prove the truth of the matter asserted. The testimony did not violate Rodriguez's rights under the Confrontation Clause. See id. at 60 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (citing Tennessee v. Street, 471 U.S. 409, 414 (1985) (holding "[t]he nonhearsay aspect of [the testimony] . . . raises no Confrontation Clause concerns."))); see, e.g., United States v. Faulkner, 439 F.3d 1221, 1225-26 (10th Cir. 2006) (noting the Supreme Court's decision in Crawford makes clear "the [Confrontation] Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted in the statement").

Furthermore, Witt testified at trial and was subject to cross-examination by Rodriguez, thereby satisfying Rodriguez's right to confront witnesses against him. See Crawford, 541 U.S. at 60 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements"). Although Witt's testimony differed slightly from Officer Claramunt's, Rodriguez was entitled to argue those inconsistencies to the jury, and such inconsistencies go to the weight of the evidence, not its admissibility. Consequently, Rodriguez's Confrontation Clause challenge lacks merit.

### D.    Sentencing Issues

Finally, Rodriguez challenges the district court's drug quantity determination and sentencing enhancements. We review de novo the district court's application of

the Sentencing Guidelines and review for clear error its factual findings.[6] <u>United States v. Mathijssen</u>, 406 F.3d 496, 498 (8th Cir. 2005).

### 1. Drug Quantity Determination

"In order to attribute a quantity of drugs to a defendant, the sentencing court is required to find by a preponderance of the evidence that the activity involving those drugs was in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to him." <u>United States v. Morin</u>, 437 F.3d 777, 782 (8th Cir. 2006) (quoting <u>United States v. Mickelson</u>, 378 F.3d 810, 822 (8th Cir. 2004)). In a drug conspiracy case, "the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." <u>Id.</u>

In this case, sufficient evidence supports the district court's determination that Rodriguez was involved in a conspiracy and Rodriguez knew, or it was reasonably foreseeable to him, the conspiracy involved at least five kilograms, but less than fifteen kilograms of methamphetamine. Witt testified she and another individual routinely transported methamphetamine from California; Atlanta, Georgia; and Texas. Flight records indicated Witt, Yone, and another individual made more than ten trips to these locations in 2002 and 2003. Witt also testified she brought back approximately one kilogram on each trip. Such testimony is borne out by Witt's arrest on December 16, 2003, while in possession of approximately one kilogram of

---

[6]Rodriguez argues the district court erred in rendering its sentencing determinations by using a preponderance of the evidence standard, asserting the Supreme Court ultimately will determine a defendant's culpability must be established by clear and convincing evidence instead of by the preponderance standard. Under the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), judicial fact-finding based on a preponderance of the evidence standard is permitted, so long as the Guidelines are applied in an advisory manner. <u>See</u> <u>United States v. Thorpe</u>, 447 F.3d 565, 569 (8th Cir. 2006). Because the district court so applied the advisory Guidelines, we reject Rodriguez's invitation to remand this case for resentencing under a stricter burden of proof.

methamphetamine after returning from California. The record also contains testimony from several co-conspirators corroborating the amount of methamphetamine involved in the conspiracy. Thus, the district court did not clearly err in calculating the drug quantity attributable to Rodriguez and setting Rodriguez's base offense level at 36.

## 2.    Aggravated Role Enhancement

Section 3B1.1(a) of the Sentencing Guidelines authorizes a four-level enhancement "[i]f the defendant was an organizer or a leader of a criminal activity." In determining whether to impose the enhancement, a sentencing court should consider the defendant's

> exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4.

Considering these factors, we find sufficient evidence to support Rodriguez's role enhancement. At trial, Witt testified Rodriguez provided $20,000 to $60,000 cash for the drug-buying trips, each time giving Witt money for her airline ticket and for the actual drug purchase. Rodriguez also coordinated Witt's transportation to and from the airport, paid Witt for delivering drugs to him after each trip, and once paid Witt's $494 cab fare when no one picked Witt up from the airport. Rodriguez also instructed Witt about what to do when Yone was detained at a California airport.

Additionally, cooperating witness Sharon Robbins (Robbins) described Rodriguez as "the top dog," and testified that in September 2003, Rodriguez arrived with a gun to enforce a drug deal gone awry and to discern the location of his money and drugs. Gallegos, another cooperating witness, testified Rodriguez received the cash for drug sales, even when others conducted transactions for him. Gallegos

-11-

described Yone's and Rodriguez's joint leadership positions, testifying Yone "was in charge of getting the dope," and Rodriguez "was in charge of selling it." Cooperating witness David Reyes corroborated this testimony by describing Rodriguez's role as picking up drug deliveries from the airport, weighing the drugs and distributing them to others, and making sure Rodriguez received the money. Such testimony demonstrates Rodriguez exercised considerable decision-making authority and participated extensively in planning and organizing the drug conspiracy's activity and the actions of its members.

Rodriguez argues the conspiracy's true leader was Yone, and that Rodriguez, like everyone else, took orders from Yone. Rodriguez's characterization of his and Yone's respective roles is unconvincing. Furthermore, for purposes of § 3B1.1(a), the defendant need not be the sole organizer or leader of a criminal organization; rather, there can be more than one organizer or leader. United States v. Zimmer, 299 F.3d 710, 719 (8th Cir. 2002); see, e.g., United States v. Placensia, 352 F.3d 1157, 1166 (8th Cir. 2003). Based on the record before us, even if Yone also was an organizer or leader, the district court did not clearly err in applying the four-level enhancement for Rodriguez's role in the drug conspiracy.

### 3. Weapon Enhancement

Section 2D1.1(b)(1) of the Sentencing Guidelines authorizes a two-level enhancement if the defendant possessed a dangerous weapon, including a firearm, in connection with a drug offense "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.3; see, e.g., Morin, 437 F.3d at 781. At trial, the government presented evidence Rodriguez (1) arrived armed at another individual's residence to enforce a drug deal, (2) possessed firearms at various drug distribution locations, (3) asked others to bring guns to trade for drugs, and (4) told others he wanted guns to protect his drug operation. Officers also seized three firearms and several rounds of ammunition from the Reeds residence during the December 16, 2003, search. Given this evidence, the district court did not clearly err in imposing the two-level weapon enhancement.

## III. CONCLUSION

For these reasons, we affirm Rodriguez's conviction and sentence.

_____