# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3618

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff/Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| Abdel-Ilah Elmardoudi, | * |
| | * |
| Defendant/Appellant. | * |

_____

Submitted: March 12, 2007
Filed: August 30, 2007

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Abdel-Ilah Elmardoudi pleaded guilty to all counts of an indictment alleging various credit card fraud offenses and escape,[1] but he conditioned his plea on his right to appeal the district court's[2] choice of remedy for violation of his speedy trial rights.

_____

[1]The counts were unauthorized access device trafficking, 18 U.S.C. §§ 1029(a)(2) and 1029(c), possession of unauthorized access devices, 18 U.S.C. §§ 1029(a)(3) and 1029(c), access device fraud, 18 U.S.C. § § 1029(a)(5) and 1029(c), and escape, 18 U.S.C. § 751(a).

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

The court had found a violation of Elmardoudi's statutory and constitutional rights in connection with an earlier indictment and had dismissed that indictment without prejudice. Elmardoudi argues that the district court should have dismissed the earlier case with prejudice, thereby barring the current prosecution. We affirm the judgment of the district court.

I.

On February 6, 2001, Elmardoudi was arrested for "shoulder surfing," that is, surreptitiously memorizing other people's calling card and credit card numbers at the Minneapolis-St. Paul airport and then passing the numbers on to other people who used them to pay for telephone calls. He was indicted for unauthorized access device trafficking, possession of unauthorized access devices, and access device fraud on March 6, 2001, and arraigned on April 4, 2001. He was committed to a halfway house in Minneapolis, but he escaped on April 19, 2001, and was a fugitive for about a year and a half, until he was eventually picked up in North Carolina on November 4, 2002.

While Elmardoudi was a fugitive, his legal entanglements multiplied. First, he was indicted for escape in a superceding indictment in the District of Minnesota. Next, he was charged in the North District of Iowa with conspiracy to commit Social Security fraud. Then, he was indicted in the Eastern District of Michigan on charges of providing material support to terrorists, as well as conspiracy and fraud with regard to visas and identification documents.[3] When he was caught in North Carolina, he had

---

[3]Although the briefing does not give any details about the Michigan case, counsel informed us at oral argument that the terrorists Elmardoudi was accused of supporting were alleged to have been connected with the September 11, 2001 attacks, which counsel suggests was why the government allowed Elmardoudi to languish in jail without bringing him to trial.

$87,620 in cash and an array of false identification documents, such as passports and birth certificates.

The government transported him to the Eastern District of Michigan to face the charge of supporting terrorists and charges of conspiracy and fraud with regard to visas and identification documents. Elmardoudi was convicted on those charges, but after trial, allegations of prosecutorial misconduct came to light,[4] and the district court there vacated the conviction and dismissed the indictment without prejudice on September 2, 2004.

By September 21, 2004, nineteen days after the dismissal of the Michigan case, Elmardoudi and the various federal prosecutors on his cases began discussing a possible "global" plea agreement which would resolve all the cases against Elmardoudi and which therefore required coordination among prosecutors and defense lawyers in three districts. Elmardoudi's lawyers and the prosecutors signed a proffer agreement on October 12, 2004, which was made conditional on Elmardoudi's passing a polygraph test. He attended a two-day proffer session in Detroit on October 13 and 14. However, the prosecutor did not arrange for the polygraph test.

Beginning in November 2004, and extending until July 26, 2005, there was a long hiatus in which the only plea negotiation activity took place in March. Elmardoudi was transferred from Michigan to Iowa, purportedly for the purpose of testifying before a grand jury, but he stayed in Iowa from December 2004 until March 5, 2005, in maximum security, without ever being called to testify or to do anything else toward resolving his case. Eventually, he was transferred back to Michigan in mid-March 2005.

---

[4]Indeed, the government joined the motion to dismiss the charges, and the lead federal prosecutor in the Michigan case was indicted for obstruction of justice and conspiracy for his role in the case.

Elmardoudi tried to protest his lengthy confinement. After he was transferred back to Michigan, he wrote a letter to the district court in Minnesota complaining about the government's inactivity on his case, but neither the prosecutors nor his own counsel received a copy of the letter. Then, on July 19, 2005, Elmardoudi, through counsel, filed a petition for habeas corpus in the Eastern District of Michigan.

As soon as Elmardoudi filed the habeas petition, the government began to move forward with his case, beginning on July 26, 2005. The government arranged a polygraph test, which took place in August 2005. The government presented him with a proposed plea agreement in mid-September 2005. Elmardoudi asked for changes to that proposal, and the government sent him a revised draft. A change of plea hearing was scheduled for September 23, 2005, in Detroit, but Elmardoudi's counsel canceled that hearing, evidently because the parties still had not agreed on such important points as whether the government would make a U.S.S.G. § 5K1.1 motion under the Sentencing Guidelines. Elmardoudi and the government disagree as to whether plea negotiations continued from October 2005 to January 3, 2006. During that time-frame, Elmardoudi wrote yet another letter to the district court in Minnesota, this time asking to be removed to Minnesota, but again, the court did not forward the letter to Elmardoudi's lawyer or to the prosecutors. By January 3, 2006, Elmardoudi had communicated to the government an unambiguous rejection of the global plea offers and requested to be transferred to Minnesota to face the charges pending there. From January 3 to January 26, 2006, Elmardoudi awaited transfer to Minnesota. Once he arrived in Minnesota, he was held in pre-trial detention until February 28, 2006, when he filed his pre-trial motions, including a motion to dismiss for violation of his right to a speedy trial.

In sum, between Elmardoudi's arraignment on April 4, 2001, and his speedy trial motion, filed February 28, 2006, almost five years passed. Elmardoudi was a fugitive for more than a year and a half of that time and was awaiting trial in Michigan for almost two years. However, the bulk of the rest of the time was spent in a glacial

process of trying to negotiate a global plea agreement disposing of charges in multiple districts, which went on from September 21, 2004, until January 3, 2006, or a year and a quarter. By way of comparison, the benchmark for the time from arraignment or indictment (whichever is later) to trial under the Speedy Trial Act is 70 days. 18 U.S.C. § 3161(c)(1).

The district court ruled on August 2, 2006, that Elmardoudi's statutory and constitutional rights to a speedy trial under 18 U.S.C. § 3162(a)(2) and the Sixth Amendment had been violated. The court painstakingly calculated the number of days that counted towards the 70 day limit set by the Speedy Trial Act, 18 U.S.C. § 3161(c)(1). Specifically, the court subdivided the time between dismissal of the Michigan charges on September 2, 2004, and the filing of the motion to dismiss for speedy trial violation on February 28, 2006. The court excluded time that was passed in active plea negotiations, citing United States v. Van Someren, 118 F.3d 1214, 1218-19 (8th Cir. 1997). The court concluded that 74 days had passed that were not excludable under any of the provisions of 18 U.S.C. § 3161(h). Additionally, the court observed that it was doubtful whether an additional 267 days, the time period from November 1, 2004, to July 26, 2005, could be excluded because there was so little activity toward reaching the global plea agreement during that time; but since the 70 day Speedy Trial Act limit had been transgressed in any case, the court concluded it was not necessary to decide about the additional 267 days.[5] The court

---

[5]The district court summarized its conclusions about which days were excludable in the following table. We have highlighted the disputed periods.

| Time Period | Event | Non-Excludable Days |
|---|---|---|
| April 4, 2001 to April 13, 2001 | Arraignment, filed pretrial motions, pretrial motions under advisement | 0 |

| | | |
|---|---|---|
| April 13, 2001 to April 19, 2001 | Order issued on pretrial motions, pretrial detention with no pending motions | 6 |
| April 19, 2001 to Nov. 4, 2002 | Fled halfway house, remained on escape status | 0 |
| Nov. 4, 2002 to Sept. 2, 2004 | Arrested, faced charges in Michigan | 0 |
| Sept. 2, 2004 to Sept. 21, 2004 | Michigan charges dismissed, active plea negotiations not yet initiated | 19 |
| Sept. 21, 2004 to Nov. 1, 2004 | Plea negotiations: entered into proffer agreement and prepared draft plea agreement | 0 |
| **Nov. 1, 2004 to July 26, 2005** | **Transferred to Iowa, then back to Michigan, one conversation about plea negotiations in March 2005 [The district court added in a footnote: "If the Court were to decide the issue of whether the time period from November 1, 2004 to July 26, 2005 could be excluded under section 3161(h)(1) and decide not to exclude the time, 267 days would be added to the calculation of non-excludable time."]** | **0** |
| July 26, 2005 to Oct. 15, 2005 | Plea negotiations: exchanged draft plea agreements, underwent polygraph exams | 0 |
| **Oct. 15, 2005 to Jan. 3, 2006** | **Plea negotiations stalled but prosecution not informed that plea agreement rejected** | **0** |
| Jan. 3, 2006 to Jan. 26, 2006 | Prosecution informed that plea agreement rejected, defendant awaited transfer to Minnesota | 23 |
| Jan. 26, 2006 to Feb. 1, 2006 | Transported from Michigan to Minnesota | 0 |

dismissed the superseding indictment without prejudice.

Elmardoudi was then reindicted and pleaded guilty to the four counts on appeal here. His plea was conditional, reserving his right to appeal on the ground that the current prosecution is barred because the earlier indictment should have been dismissed with prejudice for violation of his speedy trial rights. The district court sentenced him to 51 months' imprisonment, with the recommendation that the Bureau of Prisons should credit him with all the time he had spent in federal detention, including the time spent awaiting trial in the Eastern District of Michigan.

## II.

On appeal, Elmardoudi makes two principal arguments attacking the district court's decision to dismiss the indictment without prejudice. First, he contends that the district court abused its discretion under the Speedy Trial Act because the length of the delay calls for dismissal with prejudice. In a subsidiary point, he contends that the district court erred in excluding the 267 day period from November 1, 2004, to July 26, 2005, and the 80 day period from October 15, 2005, to January 3, 2006, from the statutory speedy trial calculation. Because the district court found that Elmardoudi's rights under the Speedy Trial Act had been violated by a lapse of 74

| Feb. 2, 2006 to Feb. 28, 2006 | Appearance in Minnesota, arraignment on superceding indictment, pretrial detention without pending motions | 26 |
|---|---|---|
| Feb. 28, 2006 to June 1, 2006 | Pretrial motions filed, under advisement by Magistrate Judge | 0 |
| June 1, 2006 to Aug. 2, 2006 | Report and Recommendation issued, briefing on objections, under advisement by this Court | 0 |
| Total | | 74 |

nonexcludable days between arraignment and the motion to dismiss, the additional two periods of time are not necessary to prove a violation of the Act. However, whether those two periods are excusable delay is still relevant to show the severity of the delay, which in turn is relevant in choosing the proper remedy for the violation. Second, Elmardoudi argues that once the district court held that his Sixth Amendment right to a speedy trial had been violated, the only possible remedy was dismissal with prejudice.

A.

The Speedy Trial Act requires that a federal criminal defendant be brought to trial within 70 days of his indictment or arraignment, whichever is later, 18 U.S.C. § 3161(c)(1), subject to excludable periods of time catalogued in the statute, for delays from such things as unavailability of the defendant, trial of the defendant on other charges, pre-trial motions, etc. See generally 18 U.S.C. § 3161(h). If more than 70 nonexcludable days elapse without the defendant being brought to trial, the indictment shall be dismissed upon the defendant's motion. 18 U.S.C. § 3162(a)(2). In this case, the parties do not dispute that time spent in active, good faith plea negotiations is excludable, but Elmardoudi contends that for the periods from November 1, 2004, to July 26, 2005 (267 days), and from October 15, 2005, to January 3, 2006 (80 days), the government has not carried its burden of proving excludability under § 3162(a)(2) by showing that the parties were actively engaged in negotiations.[6]

The Speedy Trial Act entrusts to the district court's discretion the decision of whether to dismiss with or without prejudice, and "neither remedy was given priority."

---

[6]Although Elmardoudi contends that the government must prove excludability, section 3162(a)(2) actually puts the burden of going forward on the government only for the exclusion of time under § 3161(h)(3), delay resulting from the absence or unavailability of the defendant or an essential witness.

United States v. Taylor, 487 U.S. 326, 335 (1988); see 18 U.S.C. § 3162(a)(2). The Act guides the district court's exercise of discretion:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2). In addition to these factors, a district court should consider the presence or absence of prejudice to the defendant resulting from the violation of the Act. Taylor, 487 U.S. at 334; United States v. Becerra, 435 F.3d 931, 935 (8th Cir. 2006). The boundaries of the district court's discretion are framed by the factors Congress required it to consider; if, therefore, the district court "ignore[s] or slight[s] a factor that Congress has deemed pertinent to the choice of remedy," it abuses its discretion. Taylor, 487 U.S. at 336-37. The district court is obliged to articulate its reasoning in order to permit us to review its decision. Id. at 336. Moreover, the district court abuses its discretion if it relies on a clearly erroneous factual finding or an erroneous application of law to fact. Id. at 337. However, if the district court fully considers the required factors and does not rely on clearly erroneous factual findings, "the district court's judgment of how opposing considerations balance should not lightly be disturbed." Id. Nevertheless, even if it considers only the proper factors, the district court can abuse its discretion if it commits a clear error in judgment in weighing the factors. United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir. 1987).

Elmardoudi contends that the district court relied on an erroneous conclusion that all but 74 days of the time between his arraignment and his motion to dismiss were excludable because two periods were wrongly categorized. The district court held that the 80 days between October 15, 2005, and January 3, 2006, were excludable because, even though Elmardoudi had decided sometime within this period that he did not want to continue negotiations, neither Elmardoudi nor his counsel informed the

government that the deal was off until January 3, 2006. The affidavit of Elmardoudi's counsel Katherine M. Mendendez indicates that during this time frame, the defense team, in accord with Elmardoudi's directions, held out hope to the government that a global resolution still might be worked out. We see no clear error in the district court's finding that Elmardoudi never informed the government until the end of the disputed 80 day period that he had withdrawn from plea negotiations. We therefore hold that the district court did not abuse its discretion in relying on the finding that the 80 days were excludable.

The question of whether the 267 day period from November 1, 2004, to July 26, 2005, should be excluded is a more vexing problem. The district court found that plea negotiations were almost completely stalled during that time, with only one discussion between defense and prosecutors, which took place in March 2005. Because progress was so minimal, the district court avoided deciding whether the period was excludable. In United States v. Van Someren, 118 F.3d 1214, 1218-19 (8th Cir. 1997), we held, as an alternative holding, that fourteen days were excludable because spent on plea negotiations. It is far from clear that Van Someren meant to lay down a per se rule that all time periods in which there were any open plea negotiations was excludable. Excluding a period of fourteen days, as in Van Someren, is a far different matter than excluding 267 days, as the government urges here, particularly when the negotiations were dormant most of the time. The question is all the more difficult because we have no finding of fact to review. See United States v. Yerkes, 345 F.3d 558, 561 (8th Cir. 2003) (reviewing district court's factual findings on speedy trial issue for clear error and conclusions of law de novo).

Nevertheless, we conclude that it is not necessary to remand for categorization of the 267 days, because no matter whether or not those days are categorized as excludable, the district court took into account the extent of the delay in bringing Elmardoudi to trial and the government's responsibility for the delay.

The district court considered each of the statutory factors:

> The Court concludes that dismissal without prejudice is warranted here. First, both the nature of the conduct alleged and the penalties attached to the alleged offenses demonstrate that defendant is charged with serious felony offenses. Second, while it appears that the speedy trial violations were due to the prosecution's negligence, there is no indication that the negligence was in reality an attempt to obtain a tactical advantage. Third, dismissing the case without prejudice would provide the prosecution the opportunity to seek a new indictment and pursue this possibly important case, while at the same time furthering the interests of the Speedy Trial Act by making clear that the prosecution's delay in this case was not excusable. Finally, the fact that defendant has suffered little or no prejudice in terms of unavailability of witnesses or evidence also warrants dismissal without prejudice.

(citation omitted). Elsewhere, the court expressed particular disapproval of the government's neglect during the disputed 267 day period:

> The prosecution's delay between the proffer session in mid-October 2004 until the filing of the habeas petition on July 19, 2005, seems impossible to justify. The prosecution made no arrangement for the polygraph examinations of defendant, even though the prosecution made execution of a plea agreement contingent on defendant 'passing' a polygraph examination.

Moreover, the court found that Elmardoudi had suffered prejudice due to his long detention in maximum security and held that delay had caused Elmardoudi to suffer "a general sense of discouragement that the judicial process will never end." While the court surmised that the "complexity of managing indictments in three separate federal districts at the same time contributed significantly to the extraordinary delays in the prosecution of Mr. Elmardoudi," the court nevertheless decided that the practical difficulties did not excuse the delay.

-11-

In a case in which two years and two months elapsed between indictment and motion to dismiss for a speedy trial violation, we affirmed the district court's dismissal without prejudice. United States v. Wiley, 997 F.2d 378, 384-85 (8th Cir. 1993). In Wiley, the defendant and the government had engaged in plea negotiations that ultimately failed, but which dragged on for months because of poor communication by the defendant and his lawyer and lack of diligence by the government. Even though the government was remiss in failing to follow up on its proposed offers, we discerned no abuse of discretion in the district court's remedy of dismissal without prejudice. Id. at 385. Wiley's facts were similar to those in this case (although the delay in Wiley was much longer) and its holding confirms that the district court's decision in this case was within the scope of its discretion.

Even assuming that the Speedy Trial Act's 70 day limit was exceeded by 271 days, rather than the four days explicitly found by the district court, we conclude that the district court took into account the government's lack of diligence in pursuing the plea agreement during that time and the prejudice to Elmardoudi for the long delay. We discern no abuse of discretion in the district court's choice of the remedy of dismissal without prejudice.

III.

In addition to the Speedy Trial Act violation, the district court held that Elmardoudi's Sixth Amendment right to a speedy trial had been violated. Elmardoudi argues that once the district court found his Sixth Amendment speedy trial rights had been violated, it was required to dismiss the indictment with prejudice, which is the only remedy for a Sixth Amendment speedy trial violation.[7] The government did not

---

[7]The Supreme Court has said that the only possible remedy for a Sixth Amendment speedy trial violation is dismissal. Strunk v. United States, 412 U.S. 434, 440 (1973); Barker v. Wingo, 407 U.S. 514, 522 (1972). It is generally agreed that this means dismissal with prejudice. See United States v. Jackson, 473 F.3d 660, 664

appeal the district court's finding of a Sixth Amendment violation, although it contends that it would have done so if it had been advised within its time to appeal that Elmardoudi would make the argument he now urges before us.

Not having preserved its right to attack the finding of a violation of constitutional rights, the government responds that Elmardoudi did not preserve his objection to the remedy chosen because he never contended in the district court that a Sixth Amendment violation required dismissal with prejudice. Accordingly, the government contends that the issue can only be reviewed for plain error under Fed. R. Crim. P. 52(b).

While Elmardoudi did ask the court below to dismiss with prejudice, his argument was made primarily under the Speedy Trial Act, which, as we have seen, allows the district court to choose whether to dismiss with or without prejudice. In that context, Elmardoudi argued that the district court should choose dismissal with prejudice, instead of without. He then continued, "The same result is reached under the Sixth Amendment . . . ." Thus, Elmardoudi did not contend below that the Sixth Amendment speedy trial remedy was different from the statutory speedy trial remedy or that dismissal with prejudice was mandatory. We will therefore apply plain error review to the district court's choice of remedy. See United States v. Serna-Villareal, 352 F.3d 225, 231 (5th Cir. 2003) (even though appellant moved to dismiss in district court for Sixth Amendment speedy trial violation, where he failed to raise two contentions of prejudice from the delay, court applied plain error review to those contentions).

(6th Cir.), cert. denied, 127 S. Ct. 2294 (2007); Akhil Reed Amar, Sixth Amendment First Principles, 84 Geo. L. J. 641, 650 (1996); 2 David S. Rudstein, C. Peter Erlinder, & David C. Thomas, Criminal Constitutional Law § 11.01[1][d] (2006). The government does not dispute that dismissal with prejudice is the only remedy for a Sixth Amendment speedy trial violation.

We can reverse on the basis of error that was not objected to in the district court only if there was indeed error, the error was plain, and it affected the defendant's substantial rights. United States v. Olano, 507 U.S. 725, 732-35 (1993). Once those requirements are met, we have the discretion to notice the error, but are not required to do so. Id. at 735. We will exercise our discretion to notice plain error only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," whether because the defendant is actually innocent or for some other reason. Id. at 736-37.

The government does not dispute that there was an error and that it was plain. Instead, the government contends that we should not notice the error because it does not "seriously affect the fairness, integrity, or public reputation" of these judicial proceedings. In Johnson v. United States, 520 U.S. 461, 470 (1997), and United States v. Cotton, 535 U.S. 625, 633-34 (2002), the Supreme Court held it would have been (in Johnson) or was (in Cotton) inappropriate for the Court of Appeals to notice forfeited errors where the evidence of the defendant's guilt was uncontroverted or overwhelming. In those cases, the Supreme Court held that the public's interest in conviction and punishment of the guilty outweighed competing constitutional values such as preserving the grand jury and petit jury's roles in checking prosecutorial power. See Cotton, 535 U.S. at 634. Here, Elmardoudi has pleaded guilty to crimes involving losses to the victims in the range of four to five million dollars. Elmardoudi does not contend that he was innocent or that the speedy trial violation prejudiced him in the sense of making it harder to defend himself, thus casting doubt on his guilt. Thus, while we acknowledge the gravity of the Sixth Amendment violation, we nevertheless do not find this to be a case appropriate for the exercise of our discretion to review plain error.

We affirm the judgment of the district court.

_____